**PASTRANO v. UNITED STATES.**

No. 4895.

Circuit Court of Appeals, Fourth Circuit.
April 6, 1942.

R. Palmer Ingram, of Baltimore, Md. (Emil T. Mallek, of Baltimore, Md., on the brief), for appellant.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md. (Thomas J. Kenney, Asst. U. S. Atty., of Baltimore, Md., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and WARING, District Judge.

SOPER, Circuit Judge.

Pastrano was convicted of the charge of conspiring with Bautista to commit an offense against the United States and performing certain overt acts in pursuance thereof. The object of the conspiracy was alleged to be the receipt and concealment of 763⅓ ounces of smoking opium that had been brought into the United States contrary to law. The overt acts described in the indictment included the charge that Bautista on March 21, 1941 removed from the S/S Steel Navigator a certain quantity of opium at Baltimore, Maryland, and secreted the same in his room in a hotel in that city; and that Pastrano wrote three letters to Bautista dated January 11, 1941, February 2, 1941, and February 4, 1941, with regard to the disposition of the opium. See 18 U.S.C.A. § 88; 21 U.S.C.A. § 174. Pastrano was sentenced to serve a term of imprisonment of two years and to pay a fine of $10,000, and has brought this appeal based primarily on the refusal of the District Judge to direct a verdict in his favor and upon certain statements of the District Judge in his charge to the jury. Certain rulings on the admissibility of evidence are also alleged to have been erroneous.

On December 10, 1940, Bautista was steward and Pastrano was second cook on the S/S Steel Navigator upon its return to New York City from a voyage to the Far East. Pastrano was then taken from the ship and ordered to be deported from the United States by the Immigration authorities. After a period of 24 days he was placed on the S/S Ensley City for a return to the Far East. On January 11, 1941, he sent a letter from his ship at Cristobal in the Canal Zone to Bautista in care of the Steel Navigator in New York, and on February 2, 1941, and February 4, 1941, he sent letters from Honolulu to Bautista in New York. In the first letter Pastrano asked Bautista to give some money to George Leo, 393 8th Avenue, New York City, who was said to be as close to Pastrano as a brother, to whom anything could be said. In this letter he also referred to some tea of his which he wanted Bautista to give to a friend of Pastrano in Honolulu. He suggested that when he and Bautista met they could figure out and settle up the money. In the second letter Pastrano asked Bautista not to forget to see his friend George at 393 8th Avenue in New York City and give him some money to send to Pastrano. In the third letter Pastrano asked Bautista to give some Chinese tea on board the ship to his friend in New York—not to the one in Honolulu. There was evidence that smoking opium is sometimes called "tea" or "Chinese tea" by dealers in the illicit trade.

On March 21, 1941, while the Steel Navigator was in the port of Baltimore, Bautista was arrested and the letters from Pastrano and a considerable quantity of opium were found in his room on the ship and opium was also in a suit case he was carrying when he was entering a taxi cab after he left the ship. Opium was also found in his room at a hotel in the city.

On May 31, 1941, Pastrano was brought back to the United States. He then stated he knew nothing about the letters or the opium, but at the trial it was admitted that the signatures of two of the letters were in his handwriting, and there was direct evidence that the remaining letter had been written for him by a friend, since Pastrano was able to write only his own name. In short, there was evidence from which it was reasonable to infer that the opium had been brought from the Far East on the Steel Navigator and smuggled into the United States illegally, and that Pastrano was a party to these transactions and interested in the sale and delivery of the drug in the United States by his friend and former fellow seaman on the ship.

Moreover, the finding of Pastrano's letters and the opium in Bautista's possession constituted evidence that a number of the overt acts charged in the indictment had been committed. We think that the evidence outlined was sufficient to take the case to the jury, for it is well settled that a criminal conspiracy under the federal statutes may be proved by circumstantial evidence, and that the overt acts performed by the parties to effectuate the object of the illegal agreement may be considered in determining whether the conspiracy existed. Safarik v. United States, 8 Cir., 62 F.2d 892, 896; Galatas v. United States, 8 Cir., 80 F.2d 15, 23; Marx v. United States, 8 Cir., 86 F.2d 245, 250.

The appellant claims that the judge wrongfully permitted the District Attorney to cross examine a witness for the government. Bautista had previously pleaded guilty and had been sentenced for concealing and facilitating the transportation of opium unlawfully brought into the United States. He was not placed on trial in the conspiracy case but was called by the United States as a witness against Pastrano. He admitted the possession of the opium and the letters; but he denied in substance that Pastrano had knowledge of the importation of the opium or had referred to it in his letters. The District Attorney then announced that he was taken by surprise by the testimony and asked permission to cross examine the witness and permission was given over the defendant's objection. Bautista then said in answer to questions that when he was arrested with the opium in his possession as he came off the ship, he told the officers that he was taking the opium to the hotel; and when the District Attorney asked him whether he had not told the officers that he was taking it to the man George on 8th Avenue in New York, mentioned in Pastrano's letters, he replied that he did not know; he was so scared he did not know what he said. He was then asked why he was changing his story from that he had told at the time of his arrest and that he later told in the presence of his attorney when he pleaded guilty in court. He replied that at that time he was so scared he did not know what he was saying. He remembered that his lawyer spoke to the court in his behalf, but he couldn't remember what the lawyer said. He admitted that he testified before the Grand Jury

but he could not remember whether he testified that the opium was left on the ship by another person who had sent him letters instructing him what to do with it. Thereafter he was asked whether he had hold the truth before the Grand Jury or was telling the truth at the time of his examination in court, and he replied that he was then telling the truth and could not remember what he said before the Grand Jury. Thereafter he was asked similar questions, intended to show that formerly he had said that he was acting under Pastrano's instructions in bringing in the opium and he replied in substance that he did not remember what he had said; but he added that he did not deny that he had given such testimony before the Grand Jury. His repeated answers were that he did not remember because he was scared at the time that he gave the previous testimony.

The defendant contends that the court erred in the latitude allowed the District Attorney in this cross examination, in that matter prejudicial to the defendant was injected into the case without proof or offer of proof of prior inconsistent statements by Bautista. We do not think so. It was quite plain to the court from what took place in its presence that the District Attorney was ready and willing to produce the evidence now said to be a necessary preliminary to the impeachment of the witness. This became doubly clear at the close of Bautista's testimony when the District Attorney called one of the government officers and asked him what Bautista said at the time of his arrest as to what he was going to do with the opium. The nature of the testimony which the District Attorney desired to elicit was obvious from his previous cross examination; but the defendant's attorney objected to the testimony and his objection was sustained. Hence it does not lie in his mouth at this time to complain that the testimony was not produced.

The common law rule that a party should not be allowed to impeach his own witness has long since been relaxed in certain respects, and it is now generally held that a party surprised by adverse testimony unexpectedly given by his own witness may cross examine him and even inquire whether he has not made contradictory statements at other times. The lati-

tude to be allowed in the cross examination is wholly within the discretion of the trial judge. Hickory v. United States, 151 U.S. 303, 309, 14 S. Ct. 334, 38 L.Ed. 170; St. Clair v. United States, 154 U.S. 134, 150, 14 S.Ct. 1002, 38 L.Ed. 936; Walker v. United States, 4 Cir., 104 F.2d 465, 470. There is conflict in the decisions as to whether, if a witness denies a contradictory statement attributed to him, it may be introduced in evidence in order to impeach him. Cf. Sneed v. United States, 5 Cir., 298 F. 911, 914, 915; United States v. Block, 2 Cir., 88 F.2d 618. But the contradictory evidence offered by the District Attorney in this case was not received, and it is sufficient to say that the extent of the cross examination permitted him in this instance was well within the limit of the court's discretion.

At the close of the testimony the judge delivered a charge to the jury which contained a correct statement of the law applicable to the case and a fair summary of the evidence, coupled with the statement that the jury was not bound by anything the court might say with regard to the facts, because the jury was the sole judge of the facts. The charge was objected to on the ground that there was no evidence of any conspiracy between Pastrano and Bautista, a matter that has already been discussed; and also because of a reference by the judge to Bautista's testimony now to be considered. After warning the jury that the testimony of a co-conspirator must be scrutinized with care, the judge said: "You have heard the statements of the government here that this witness co-conspirator changed his testimony and a suggestion that he has not told to you the same story he previously told, either through fear of the person here on trial before you, or for some other reason. You are to take into account his testimony, as you are to take into account in arriving at your verdict the motives of all witnesses that you have heard. Motives play a strong part in any criminal trial. What are the motives of the witnesses? Are they telling the truth? Or, if they are not deliberately falsifying under oath, are they nevertheless mistaken in what they may have testified to?"

Objection to this part of the charge was taken at the time and is now urged on the ground that there was no evidence before the jury that Bautista had actually changed his testimony. We think that this objection is hyper-critical and devoid of substantial merit. In the first place, the statement complained of was a literally correct description of an incident that had taken place in the jury's presence, for the District Attorney had stated in their hearing that he was surprised by change in Bautista's testimony. While there was no direct evidence of the change, the circumstances were such that the jury could not fail to infer that the District Attorney had been taken by surprise. It was shown that Bautista had been a witness before the Grand Jury which brought in the conspiracy indictment against both men, and it was not likely that the prosecutor in the trial of one of them would have called the other to the stand unless his previous testimony was favorable to the United States. That this was the true situation was quite obvious to the jury; and when the witness repeatedly declared that he did not remember what he had previously said, and that he could not deny that he had given testimony unfavorable to Pastrano before the Grand Jury, there was little room to doubt that some change in the witness' story had taken place. Under these circumstances it was entirely proper for the judge to charge the jury that they should take Bautista's testimony into consideration and that it should be scrutinized with care. In this connection the jury might have been told also that even if they believed that Bautista had changed his testimony, this circumstance should not be taken as evidence of Pastrano's guilt; but no request for such a charge was made by the defendant, and since the judge's reference to the District Attorney's statement gave the jury no information that they did not already have, we find no ground for reversing the judgment. The same result would be reached if it should be supposed that the judge's comment was technically inaccurate, since the circumstances show that it could not have affected the verdict, and therefore could not be considered prejudicial error.

Affirmed.